**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| ANCORA TECHNOLOGIES, INC. | § | |
| *Plaintiff,* | § | |
| | § | **CIVIL NO. 1-20-CV-00034-ADA** |
| v. | § | |
| | § | |
| LG ELECTRONICS INC., LG | § | |
| ELECTRONICS U.S.A., INC., | § | |
| SAMSUNG ELECTRONICS CO., LTD., | § | |
| AND SAMSUNG ELECTRONICS | § | |
| AMERICA, INC., | § | |
| *Defendants.* | § | |

<u>**SUPPLEMENTAL CLAIM CONSTRUCTION ORDER**</u>

Before the Court are the Parties' claim construction briefs: Plaintiff Ancora Technologies, Inc. ("Ancora") opening, responsive, and reply briefs (ECF No. 44, 50, and 53, respectively) and Defendants LG Electronics Inc., LG Electronics U.S.A., Inc., Samsung Electronics Co., Ltd., and Samsung Electronics America, Inc., ("Defendants") opening, responsive, and reply briefs (ECF No. 45, 49, and 52, respectively). The Court held the Markman hearing on May 29, 2020. ECF No. 66. During that hearing, the Court informed the Parties of the final constructions for all terms. The Court entered its Final Claim Construction Order on June 2, 2020. ECF No. 69. This Order does not alter any of those constructions but provides additional rationale for the Court's constructions.

## I.      BACKGROUND

Ancora filed this lawsuit alleging that Defendants infringed U.S. Patent No. 6,411,941 ("the '941 Patent"). Compl. ¶ 16, ECF No. 1. The '941 Patent is entitled "Method of Restricting Software Operation Within a License Limitation." *Id.* The patent is a "method and system of identifying and restricting an unauthorized Software program's operation." '941 Patent at 1:6–8. The "background" section of the specification describes how "illegal copying [of software]

1

represents billions of dollars in lost profits to commercial software developers" and the need to "substantially reduce or overcome the drawbacks" of existing solutions. *Id.* at 1:16–18, 33–35.

Although the technology is not something completely new, the patent describes how the restriction process is performed. *Id.* at 1:6–8. "This method strongly relies on the use of a key and of a [license] record, which have been written into the non-volatile memory of a computer." *Id.* at 1:40–42. The invention allows for the immediate detection of unauthorized use of software and a responsive defined action (*e.g.*, informing the user of the unlicensed status or halting the operation of the program under question). *Id.* at 2:22–26. The key is stored in the non-volatile portion of the BIOS, which cannot be removed or modified. *Id.* at 1:50–52. The key is used in conjunction with other identification information to encrypt the license record, which is stored in another non-volatile section of the BIOS that may be optionally erased or modified. *Id.* at 1:40–42. The invention utilizes an agent to set up a verification structure in the non-volatile memory of the BIOS. *Id.* at 6:64–65. The verification structure is then used to verify the program which is being used. *Id.* at 7:1–3.

A license verifier application can then encrypt the license record of any given software using the key and compare it to the already encrypted license record stored in the BIOS. *Id.* at 2:13–19. In the case of a match, the program is verified to run. *Id.* at 2:19–20. However, if a computer's data were to be copied, an unauthorized copy of the encrypted license record could be stored on a different computer. *Id.* at 2:20–26. When attempting to run the software on the second computer, the encrypted license records will not match as they were encrypted with two different keys. *Id.* at 2:56–59.

## II.    LEGAL PRINCIPLES

The general rule is that claim terms are generally given their plain-and-ordinary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014), *vacated on other grounds by* 135 S. Ct. 1846, 1846 (2015) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time."). The plain and ordinary meaning of a term is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313.

"'Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)). "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). Technical dictionaries may be helpful, but they may also provide definitions that are too broad or not indicative of how the term is used in the patent. *Id.* at 1318. Expert testimony also may be helpful, but an expert's conclusory or unsupported assertions as to the meaning of a term are not. *Id.*

The "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning are when the patentee (1) acts as his/her own lexicographer or (2) disavows the full scope of the claim term either in the specification or during prosecution. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). To act as his/her own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* To disavow the full scope of a claim term, the patentee's statements in the specification or prosecution history must represent "a clear disavowal of claim scope." *Id.* at 1366. Accordingly, when "an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

Under the doctrine of claim differentiation, a court presumes that each claim in a patent has a different scope. *Phillips*, 415 F.3d at 1314-15. The presumption is rebutted when, for example, the "construction of an independent claim leads to a clear conclusion inconsistent with a dependent claim." *Id.* The presumption is also rebutted when there is a "contrary construction dictated by the written description or prosecution history." *Seachange Int'l., Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005). The presumption does not apply if it serves to broaden the claims beyond their meaning in light of the specification. *Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1326 (Fed. Cir. 2017).

### A.  Means-Plus Function Claiming

A patent claim may be expressed using functional language. *See* 36 U.S.C. § 112 ¶ 6[1]; *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 (Fed. Cir. 2015). In particular, § 112 ¶ 6 provides that a structure may be claimed as a "means . . . for performing a specified function"

---

[1]The AIA changed the numeration of the relevant subsection from § 112 ¶ 6 to § 112(f). The substance of the subsection did not change, so the Court will refer to the relevant subsection as § 112 ¶ 6 in keeping with the numeration at the time of the patent filing.

and that an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002). While there is a rebuttable presumption that § 112 ¶ 6 applies when the claim language includes "means" or "step for," and that § 112 ¶ 6 does not apply in the absence of those terms, the presumption stands or falls according to whether one of ordinary skill in the art would understand the claim with the functional language, in the context of the entire specification, to denote sufficiently definite structure or acts for performing the function. *Id.*

When it applies, § 112 ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347. Construing a means-plus-function limitation involves multiple steps. "The first step . . . is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "[T]he next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* The focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.* The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). However, § 112 ¶ 6 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

For § 112 ¶ 6 limitations implemented by a programmed general-purpose computer or microprocessor, the corresponding structure described in the patent specification must include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339,1349 (Fed. Cir. 1999). The corresponding structure is not a general-purpose computer but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

### B. Indefiniteness

 "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application was filed. *Id.* at 911.

In the context of a claim governed by 35 U.S.C. § 112, ¶ 6, the claim is indefinite if the claim fails to disclose adequate corresponding structure to perform the claimed functions. *Williamson*, 792 F.3d at 1351–52. The disclosure is inadequate when one of ordinary skill in the art "would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim." *Id.* at 1352. Computer-implemented means-plus-function claims are indefinite unless the specification discloses an algorithm to perform the function associated with the limitation. *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1319 (Fed. Cir. 2012).

### III.    ANALYSIS

After providing preliminary claim constructions to the parties on May 28, 2020, the parties agreed oral argument was necessary for five only claim terms. Although the Court already entered the final constructions of these five terms, and the remaining terms, the Court takes this opportunity to provide its rationale for the five claim terms argued during the *Markman* hearing.

### A.  Order of the Claim 1 Steps

| Ancora's Proposed Construction | LG/Samsung's Proposed Construction |
|---|---|
| The "verifying a program" step cannot be completed until the "selecting a program" and "using an agent" steps have been completed, and the "acting on the program" step cannot be completed until the "verifying" step has been completed. | The "verifying the program" step and "acting on the program" step of Claim 1 must occur, in order, after the "selecting a program" step and "using an agent" step. |

Claim 1 of the '941 patent recites a "method comprising the steps of:

> **selecting** a program residing in the volatile memory,
> **using** an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record,
> **verifying** the program using at least the verification structure from the erasable non-volatile memory of the BIOS, and
> **acting** on the program according to the verification."

'941 Patent, Cl. 1 (emphasis added). The crux of the dispute between the Parties is whether a step must start and finish before the next step can start or whether the execution of the two steps may at least partially overlap, so long as the steps are **completed** in the order required by the patent.

Ancora contends that the first two listed steps, "selecting a program" and "using an agent," may occur in any order, and that the third listed step, "verifying the program," need only be **completed** after the completion of the prior two steps, thus allowing its commencement at any time. ECF No. 50 at 23–24. Ancora similarly contends the fourth listed step, "acting on the

program," may occur at any time so long as it is not completed before the completion of the "verifying the program" step. *Id.* Thus, Ancora argues that, if the steps of the method require order, the order is based on the steps' completion as opposed to their commencement. *See id.*

Defendants argue that there must be more order to the occurrence of the steps. ECF No. 45 at 25–26. While Defendants agree that the "selecting a program" and "using an agent" steps may occur in any order, they argue that the "verifying the program" step may not begin until the completion of the prior two steps. *Id.* Defendants similarly contend the "acting on the program" step may not begin until the completion of the "verifying the program" step. *Id.* They contend that the grammar and logic of the claim requires the order presented by Defendants. *Id.*

### 1. Some order is required for the Steps

When the steps of a method claim actually recite an order, the Court will ordinarily construe the claim to require order. *Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1306 (Fed. Cir. 2015). Courts use a two-part test for determining if the steps of a method claim that do not otherwise recite an order must be nonetheless performed in a specific order: (1) the Court first examines the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written, and (2) if not, the Court next looks to the rest of the specification to determine whether it "directly or implicitly requires such a narrow construction." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369–70 (Fed. Cir. 2003) (quoting *Interactive Gift Express, Inc. v. CompuServe, Inc.*, 256 F.3d 1323, 1343 (Fed. Cir. 2000). "A method claim can also be construed to require that steps be performed in order where the claim implicitly requires order, for example, if the language of a claimed step refers to the completed results of the prior step." *Kaneka Corp.*, 790 F.3d at 1306 (citing *E-Pass Techs., Inc. v. 3Com Corp.*, 473

F.3d 1213, 1222 (Fed. Cir. 2007). Otherwise, the sequence in which such steps are written is not a requirement. *Altiris, Inc.*, 318 F.3d at 1370.

The steps of the method claim do not actually recite an order for the steps to follow; therefore, the Court must proceed to the two-part test to determine if order must be given to the steps. Looking to the claim language of the steps themselves, the steps require *some* order to properly function because some of the actions in the claimed steps refer to the completed results of actions in a prior step. *See Kaneka Corp.*, 790 F.3d at 1306. Limitation [b] recites, in part, "using an agent to **set up a verification structure**," while Limitation [c] recites, in part, "verifying the program using at least **the verification structure**." '941 Patent, Cl. 1 (emphasis added). Because Limitation [b] sets up the verification structure while Limitation [c] uses it, the use of the verification structure—as described in Limitation [c]—cannot complete until the setup of the verification structure—as described in Limitation [b]—has completed.

Further, Limitation [c] recites, in part, "**verifying** the program using at least the verification structure," while Limitation [d] requires "acting on the program according to **the verification**." *Id.* (emphasis added). Because Limitation [c] verifies the program while Limitation [d] acts on the program according to the verification, the acting step "according to the verification—as described in Limitation [d]—cannot complete until the verification of the program—as described in Limitation [c]—has completed.

While the language of the claim requires an order to the completion of certain limitations in the '941 Patent, neither the claim language nor the specification requires an order to when the steps begin. Defendants postulate that "selecting a program," as described in Limitation [a] must necessarily begin and end before "verifying the program," as described in Limitation [c], may begin. ECF No. 45 at 25. However, Defendants have provided no evidence to show why the

selecting action and the verifying action could not be performed concurrently. Further, Defendants' argument runs counter to Federal Circuit precedent. *See Kaneka Corp.*, 790 F.3d at 1306 ("We also disagree with the district court's conclusion and Defendants' arguments on appeal suggesting that the claimed order requires that each step occur independently or separately."). In *Kaneka*, the court found that a claim method describing steps to an oxidation process required *some* order, but the claims did not exclude a continuous process or one "in which every claim step is occurring simultaneously." *Id*. This Court similarly finds no reason to impose all of the limitations on the claim steps that Defendants urge.

### 2. The Court's Construction for the Order of Claim 1's Steps

The Court finds that Claim 1 presents no restrictions on when any limitation may start, nor when the entire step must fully complete. Instead, Claim 1 presents restrictions only on when certain actions must complete before another is also completed. Thus, the Court will construct the order of the Claim 1 steps as follows: use of the verification structure, as described in Limitation [c], cannot complete until the "set up a verification structure" step has completed, as described in Limitation [b]; "acting on the program according to the verification," as described in Limitation [d], cannot complete until the "verifying the program" is completed as described in Limitation [c]; the "selecting a program residing in the volatile memory," as described in Limitation [a], can occur at any time.

### B. "license" (Claim 1 Preamble)/ "license record" (Claims 1, 3, 6, 8, 9, 14, 16)

| Ancora's Proposed Construction | LG/Samsung's Proposed Construction |
|---|---|
| The portion of the preamble reciting "A method of restricting software operations within a license . . ." is non-limiting. Thus, the term "license" does not need to be construed. | The entire preamble of the claim is limiting.<br><br>"license" means a legal contract between a software provider and a user that specifies the rights of the user to use, distribute or resell the software |
| "license record" means "a record associated with a licensed program with information for verifying that licensed program" | "license record" means "a record associated with a program with information for verifying that the program is licensed" |

The parties dispute whether a portion of the preamble of Claim 1 is limiting, and therefore dispute whether the term "license," which appears only in the preamble of Claim 1, needs to be construed. They further dispute the construction of the term "license record," which is found in the independent Claim 1 as well as several of the proceeding dependent claims. Because the term "license" may be necessary to construe "license record," the Court will address both terms together.

### 1. The portion of the preamble containing "license" is non-limiting, and the term "license" does not need to be construed.

The preamble of Claim 1 recites:

> "**A method of restricting software operation within a license** for use with <u>a computer including an erasable, non-volatile memory area of a BIOS of the computer, and a volatile memory area</u>; the method comprising: . . ."

'941 Patent, Cl. 1 (emphasis added). The Parties agree that the underlined portion of the preamble is limiting to the claim. ECF No. 4–5. However, the Parties disagree on whether the emboldened portion of the preamble is limiting. *Id.*

Courts presume that the preamble does not limit the claims. *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010). In light of this presumption, a preamble limits the invention if it recites essential structure or steps, or if it is "necessary to give life,

meaning, and vitality" to the claim. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)). "Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" *Catalina*, 289 F.3d at 808 (quoting *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997)). Further, the fact that a portion of the preamble is limiting does not require that the entire preamble be limiting—particularly if the portion in question is "one that only states the intended use of the invention." *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015). The Federal Circuit has provided some "guideposts" regarding whether the preamble is limiting: (1) if the preamble provides antecedent basis, (2) if the preamble is essential to understand limitations or terms in the claim body, (3) if the preamble recites "additional structure or steps underscored as important by the specification," and (4) "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art." *Catalina*, 289 F.3d at 808–09.

Ancora argues that the portion of the preamble that includes the term "license" does not provide an antecedent basis for a later term, nor does it recite essential structure underscored by the specification. ECF No. 44 at 5. Ancora asserts that because the term "license" never appears alone in the body of the claims, such an absence reinforces their argument that the first part of the preamble does not provide antecedent basis for any of the claims and is thus non-limiting. *Id*. Ancora further contends that the language in the first portion of the preamble merely states an intended use, as opposed to an essential structure, and is thus non-limiting. *Id*. (citing *TomTom*, 790 F.3d at 1322.

Defendants argue that the totality of the record indicates that the preamble is limiting for two reasons: (1) the intrinsic record shows that the invention is directed to limiting access to licensed programs and not merely limiting access to any program; and (2) "license" as mentioned in the preamble provides antecedent basis for many phrases in the asserted claims. ECF No. 49 at 19–20. For example, Defendants argue that "license" provides antecedent basis for the terms "license record," "license authentication bureau," "request for license," and "licensed software program," *inter alia*. *Id.* at 20, n.8.  The Court disagrees on both fronts.

First, while licensure of specific programs may be an integral purpose and function of the invention, the claim body adequately addresses the use of a license record to verify a specific program. *See* '941 Patent, Claim 1. Thus, the '941 Patent "defines a structurally complete invention in the claim body" and uses the disputed portion of the preamble "only to state a purpose or intended use for the invention."  *See Catalina*, 289 F.3d at 808. Therefore, the preamble need not be limiting on this basis.

Second, "license," as mentioned in the preamble of Claim 1, does not provide antecedent basis for the phrases which Defendants asserts. Plaintiff is correct that none of the terms or phrases which Defendants asserts has antecedent basis with "license" is led by the articles "said" or "the" on its initial appearance. *See generally* '941 Patent at 6:58–8:68. The Federal Circuit has found that a preamble term did not provide a necessary antecedent basis for the claim term in the bodies of the independent claims. *Am. Med. Sys., Inc. v. Bioletic, Inc.*, 618 F.3d 1354, 1359 (Fed. Cir. 2010). Notably, the court found that "the generic term . . . in the preamble did not provide any context essential to understanding the meaning of the claim term in the body of each claim. *Id.* The Court finds that case instructive here, where the generic term "license" in the preamble does not provide essential context or definition for understanding the meaning of terms such as

"license record" or "request for license" found in the body of Claim 1 or the proceeding claims. *See id.*

The Court also finds the preamble and ruling in *TomTom* to be instructive to this case. 790 F.3d at 1322–23. There, the Federal Circuit found the intended-use portion of a preamble to be non-limiting and therefore not requiring construction, even though the phrase following the intended-use portion was limiting. *Id.* The Federal Circuit found that the portion was merely "language stating a purpose or intended use and employs the standard pattern of such language: the words 'a method for a purpose or intended use comprising,' followed by the body of the claim, in which the claim limitations describing the invention are recited." *Id.* at 1324. The structure of the preamble in this case is highly similar to that in *TomTom*, and the Court finds no reason to stray away from that precedent. *See* 790 F.3d at 1322

Having found that the portion of the preamble that includes the "license" does not recite essential structure or steps, or give necessary life, meaning, and vitality to the claim, nor that it provides antecedent basis for any of the claims, the Court finds this portion of the preamble to be non-limiting. *See* Catalina, 289 F.3d at 808. Thus, the term "license" in the intended-use portion of the preamble does not require construction.

### 2.  "license record"

The Parties dispute the scope of the purpose of the "license record," which is described in the body of Claim 1, as well as many proceeding dependent claims. Ancora argues that the license record holds information and is used with a licensed program "for verifying that licensed program." ECF No. 44 at 7–8. Defendants, on the other hand, argue that the license record holds information and is used "for verifying that a program is licensed." ECF No. 49 at 22–23. While a

fine distinction, Ancora argues that Defendants' construction would limit the use of a license record entirely to confirming whether the program being run is licensed. *Id.*

Ancora argues that Defendants' proposed construction suggests that the program from which the license record is derived must have a specific legal or contractual status. ECF No. 44 at 7. Ancora contends that the patent uses the word "licensed" to refer to authorization or verification to run—"a concept that can include a program's legal or contractual status but is not limited to it." *Id.* Ancora's position is that a license record could comprise only information sufficient to identify a program's manufacturer, so long as it allows the program to run on the computer. *Id.* at 8. Plaintiffs argue their proposed construction is consistent with a past court's construction of the same term from the same patent in a separate litigation. *Id.* at 7 (citing *Ancora Techs., Inc. v. Apple Inc.*, 2012 WL 6738761, at *11 (N.D. Cal. Dec. 31, 2012) (construing "license record" to be "a record from a licensed program with information for verifying that licensed program")).

Defendants counter that Ancora's proposed construction improperly broadens the license record because verifying "a licensed program" presumes the program is already licensed, and the program is then verified. ECF No. 45 at 24. Defendants argue that Ancora's construction would potentially encompass merely confirming that a program was not corrupted during transmission, and this would be an improper broadening of the claim's scope. Defendants believe their construction is correct because the "purpose of the alleged invention is to utilize a 'license record' to verify that a program is, in fact, licensed to run on a computer." *Id.* While Defendants insist their construction mirrors the specification, they fail to cite anything to support their position. *See id.*; ECF No. 49 at 22–23; ECF No. 52 at 14.

Neither the claim nor the specification defines the term "license record." *See generally* '941 Patent. Because the Parties dispute the meaning of the term "license record," the Court will provide a construction consistent with the body of the claim and the specification. *Phillips*, 415 F.3d at 1316. While the '941 Patent never defines "license record," the specification does indicate what information may comprise it. The Summary of the Invention includes a non-limiting example in which the license record includes "author name, program name and number of licensed users (for network)." '941 Patent at 1:55–57. The Detailed Description of a Preferred Embodiment also provides a non-limiting example of a license record that includes application names, vendor name, and number of licensed copies. *Id.* at 5:25–35. The specification further contemplates contents which are used to form a license record which "**may** include terms, identifications, specifications, or limitations related to the manufacturer of a software product, the distributor of a software product, the purchaser of a software product, a licensor, a licensee, items of computer hardware or components thereof, or to other terms and conditions related to the aforesaid." *Id.* at 6:7–17 (emphasis added). The specification never limits what information could make up the license record and only provides varying, non-limiting examples on what could comprise the license record. These examples show that while the license record verifies that a program is authorized to run and may include information such as a program name, author, or purchaser to verify that a program is licensed, it may also contain ancillary information not used to verify the authorization of the program, and thus not limited to, "verifying that a program is licensed." *See Apple Inc.*, 2012 WL 6738761, at *11.

Because the Parties disagree about the scope of the term, the term requires construction by the Court. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties present fundamental disputes regarding the scope of the claim

term, it is the court's duty to resolve it."). While the Parties' proposed constructions both use the word "record," the Court finds that some clarification of this word is necessary. The specification contemplates that the content which makes up a license record is not limiting and could include a number of items (author name, program name, items of computer hardware, etc.). *See supra* at 14; '941 Patent at 1:55–57, 5:25–35; 6:7–17. These contents, in the context of the '941 Patent, are stored as data. '941 Patent at 5:22–27 ("Establishing a license-record includes . . . encrypting of the contents used to form a license-record with other predetermined data contents . . .").

The Court also finds that the license record is associated with "a licensed program," as opposed to merely "a program." Establishing a license record includes encrypting "the contents used to form a license-record . . . and establishing the encrypted license-record in one of the at least one established license record locations." *Id.* at 6:22–28. The "contents used to form a license-record" are found included in a licensed software program. *Id.* at 6:6–9 ("[t]he licensed-software-program includes contents used to form a license record"). It follows that the "license record" as described in Claim 1 and the following dependent claims would be associated with "a licensed program." While the Court is not bound by another trial court's construction of a claim term, the Court notes that its construction is consistent with the past construction of the same term within the same patent. *See Ancora Techs., Inc. v. Apple Inc.*, 2012 WL 6738761, at *11 (N.D. Cal. Dec. 31, 2012) (construing "license record" to be "a record from a licensed program with information for verifying that licensed program").

For the foregoing reasons, the Court construes "license record" as "data associated with a licensed program with information for verifying that licensed program."

### C. "set up a verification structure"

| Ancora's Proposed Construction | LG/Samsung's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "forming a structure by encrypting a license record using a pseudo-unique key for each computer" |

Defendants construe the meaning of the claim term "set up the verification structure" as "forming a structure by encrypting a license record using a pseudo-unique key for each computer." ECF No. 45 at 11. Defendants point to the "Summary of the Invention" specifically to indicate that the formation of the verification structure involves encrypting a license record using a pseudo-unique key. *Id.* (citing '941 Patent at 1:38–42) ("[t]his method strongly relies on the use of a key and of a record). Defendants cite further to the specification which states that the verification structure "is implemented by encrypting the license record (or portion thereof) using said key (or portion thereof) exclusively or in conjunction with other identification information) [sic] as an encryption key." *Id.* (quoting '941 Patent at 1:62–65, 6:18–28, 6:62–65).

Defendants also argue that the prosecution history supports their construction. *Id.* at 12. Defendants point out that the applicants relied on more than the "clear language" of the claim to overcome the prior art. ECF No. 49 at 8. During prosecution, the patentees argued that the present invention's disclosure of the verification structure prevented anticipation by previous patents. ECF No. 45 at 12 (citing Ex. 8 at 6). The patentees further argued that the '941 Patent overcomes the deficiencies of previous patents through the encryption of the license record using a key unique to the computer. *Id.* at 13 (citing Ex. 8 at 8–9). The applicants acknowledged in subsequent correspondence with the USPTO that the "pseudo-unique key [was] recited in Claims 1 and 20" even after removing "unique key" of the preamble of claim 1. ECF No. 49 at 8. (quoting ECF No. 45, Ex. 8 at 3). Defendants contend that Ancora should not be allowed to disavow its statements as encrypting the verification structure using a pseudo-unique key of the

computer is integral to the invention in light of the patentee's explanation. *Id.* at 7–8 (citing *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) ("[A]n inventor may disavow claims lacking a particular feature when the specification describes 'the present invention' as having that feature.") (internal citations omitted)).

Defendants also argue that the embodiments that do not use a "key" to set up a verification structure simply repeat the language of the claims. *Id.* at 9. Defendants contend that the embodiments call for "setting up a verification structure in the non-volatile memories" which requires the use of a pseudo-unique key according to the prosecution history. *Id.* (citing '941 Patent at 2:67–3:1). Defendants also note that the embodiments cited by Ancora do not exclude the use of a key in this step. *Id.*

Ancora, seeking an application of the plain and ordinary meaning, argues that Defendants' construction is inconsistent with the specification and the claim language. ECF No. 44 at 21. Ancora contends that the Defendants conflate the "set up a verification structure" step with the process for "establishing a license-record" in Claim 8. *Id.* (citing '941 Patent at 5:40–52). As such, Ancora argues that this conflation makes this portion of Claim 8 redundant and creates a conflict with Claim 7. ECF No. 53 at 11. Ancora similarly contends that the specification and the claims disclose embodiments that do not use a "key" to set up verification structure. ECF No. 44 at 21–22 (citing '941 Patent at 2:62–3:3). Ancora also points out that the "using . . . license record information in the program" limitation is redundant due to the presence of the requirement that "the verification structure accomodat[e] data that includes at least one license record." *Id.* at 22.

Ancora also argues that Defendants' proposed construction incorrectly limits the invention. ECF No. 50 at 10. The "Summary of Invention" states only that "[t]he present

invention relates to a method of restricting software operation within a license limitation" and "strongly relies on the use of a key" without requiring the use of a key. *Id.* (quoting '941 Patent at 1:39–41). Ancora further argues that the remaining portions of the specification cited by the Defendants provide more support to Ancora's position. *Id.* The implementation of the verification structure "by encrypting the license record (or portion thereof) using said key (or portion thereof) exclusively or in conjunction with other identification information) [sic]" is described as "a specific non-limiting example." *Id.* (citing '941 Patent at 1:44–45). Similarly, Ancora notes that the Figure 2 embodiment permits the "setting up" step to be satisfied by actions other than "encrypting a license record using a pseudo-unique key." *Id.* (quoting '941 Patent at 6:18–28). Ancora argues that the references are not limiting because the specification "does not uniformly refer to [Defendants' limitation] as being co-extensive with the entire invention." *Id.* at 10–11 (quoting *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1137 (Fed. Cir. 2011)).

Ancora also disagrees with Defendants' contention that the patentee stated that every claim of the invention includes "forming a structure by encrypting a license record using a pseudo-unique key for each computer" limitation. *Id.* Ancora points to statements from the May 23, 2001 Response and the February 5, 2002 Response that indicate that the patentee did not intend to limit every claim because some embodiments may not use a key. *Id.* (citing ECF No. 45, Ex. 4 at 6; ECF No. 45, Ex. 8 at 2). The patentee further explained that the use of the key was not a requirement since the key "may also be used for encryption of record or decryption of encrypted license record all as required and appropriate." *Id.* at 12–13 (quoting ECF No. 45, Ex. 4 at 6).

In response to the "present invention" noted by Defendants, Ancora also points out that the patentee pointed solely to Claim 18 for the contention that "[a] license record is extracted from the software program and encrypted using the unique key stored in the computer." *Id.* at 13 (quoting ECF No. 45, Ex. 4 at 8). Ancora cites to Federal Circuit authority indicating that these equivocal statements deriving from the specification and the prosecution history would not be found to be a clear and unequivocal disclaimer. *Id.* (citing *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 798 (Fed. Cir. 2019); *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016)).

Defendants dispute their alleged conflation of the "set up the verification" step in Claim 1 with the process for "establishing a license record" in Claim 8. *Id.* at 9–10. Defendants argue that Ancora's position contradicts both the specification and the prosecution history. *Id.* The specification states that setting up a verification structure requires establishing the existence of a pseudo-unique key and establishing a license record location. *Id.* at 10 (citing '941 Patent at 6:18–28). The second step of "establishing a license record" requires encrypting the license record and then establishing the encrypted license record in the memory. *Id.* Defendants view Claim 8 as uniquely adding to the establishment step that the license record is combined "with other predetermined data contents." ECF No. 52 at 5–6. In support of their interpretation, Defendants note that the doctrine of claim differentiation only requires some difference between the claims. *Id.* (citing *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1358 (Fed. Cir. 2016). If the Court determines that the Defendants' construction creates a redundancy, Defendants argue that the doctrine cannot be used to broaden the correct scope of the claims as set forth in the specification and prosecution history. *Id.* at 6 (citing *Seachange*, 413 F.3d at 1369). Defendants interpret their construction as congruent with how the applicants characterized this step to the

Examiner. ECF No. 49 at 6 (citing *Seachange*, 413 F.3d at 1372–73 ("Where an applicant argues that a claim possesses a feature that the prior art does not possess in order to overcome a prior art rejection, the argument may serve to narrow the scope of otherwise broad claim language.")).

The Court recognizes that Defendants' arguments regarding the prosecution history have some merit. The prosecution history offers some support for Defendants' construction as the patentee stated, "in the present method, the verification structure is formed by using a unique key for each computer and license record information in the software." *See* ECF No. 45, Ex. 4. However, the Court does credit Ancora's response that the statement only referred to a preferred embodiment. *See* ECF No. 50 at 10–11. The limitation found in this single preferred embodiment does not signal a clear and unequivocal disclaimer of claim scope to the Court. *See Thorner*, 66 F.3d at 1366. The Court also notes that the patentees relied on the encryption of the verification record by using a key unique to the computer in order to overcome prior art. *See* ECF No. 45, Ex. 8 at 8–9). However, as Ancora points out, that later correspondence with the USPTO did not solely rely on this statement. *See* ECF No. 45, Ex. 4 at 8. While the Court credits Defendants' argument, the Court cannot find that Ancora made a clear and unequivocal disavowal of the scope of the claim without more evidence. *See Thorner*, 66 F.3d at 1366.

Defendants also point to the specification for support, but the Court does not find this example compelling. *See* ECF No. 45 at 11. Defendants cite to the specification that states that the verification structure "is implemented by encrypting the license record (or portion thereof) using said key (or portion thereof) exclusively or in conjunction with other identification information) [sic] as an encryption key." *See id.* (quoting '941 Patent at 1:62–65). However, the Court acknowledges Ancora's point that the portion of the specification cited to by the Defendants provides a specific non-limiting example. *See* '941 Patent at 1:44–45). Moreover, the

Court finds the absence of a requirement of a key compelling. *See id*. As such, the Court determines that the limitation proposed by the Defendants should not be read into every claim.

The Court also agrees with Ancora that Defendants' construction would lead to a duplicative limitation. *See* ECF No. 44 at 21. Ancora contends that Claim 8 already possesses Defendants' proposed limitation by detailing the formation of "a license record by encrypting of the contents used to form a license record with other predetermined data contents, using the key." *See id.* (quoting '941 Patent at 5:40–52). Defendants argue that Claim 8 adds the limitation that the license record is combined "with other predetermined data contents." *See* ECF No. 52 at 5–6. While the Court recognized the merit of the arguments of both parties during the hearing, the Court notes that a portion of Claim 8 would still be redundant if Defendants' construction was granted. *Compare* ECF No. 52 at 5–6 *with* '941 Patent at 5:40–52. Defendants' construction would eliminate the difference between the steps in Claims 1 and 8, so adding Defendants' proposed limitation would violate the doctrine of claim differentiation. *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006) ("[A]n independent claim should not be construed as requiring a limitation added by a dependent claim.").

In light of the above, the Court deems the Defendants' construction inadequate. However, the Court cannot grant the term its plain and ordinary meaning since both parties dispute the entirety of the term. *See O2 Micro*, 521 F.3d at 1362. The Court ultimately finds meaning for the claim term in the specification. The Court cites to the specification immediately following "setting up the verification structure" which states "establishing or certifying the existence of a pseudo unique key . . . and establishing at least one license-record location." *See* '941 Patent at 6:18–21. The Court also cites to the specification defining "establishing a license-record" which

23

states "forming a license-record by at least partially encrypting of the contents used to form a license-record with other predetermined data contents, using at least part of the pseudo-random key; and storing the encrypted license-record." *See id.* at 6:22–27. The Court recognizes that the description of the establishment of the license-record location is only one possibility, so the Court also includes "at least partially" and "at least part of" which are also found in the specification. *See id.* at 1:62–67.

Therefore, the Court construes "set up a verification structure" as "establishing or certifying the existence of a pseudo-unique key and establishing at least one license-record location." With this construction, the Court attaches a footnote not for the jury stating "'Establishing at least one license-record location' may include the steps of forming a license-record by at least partially encrypting the contents used to form a license-record with other predetermined data contents, using at least part of the pseudo-unique key; and storing the encrypted license-record."

### D. "acting on the program according to the verification"

| Ancora's Proposed Construction | LG/Samsung's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "(i) allowing the use of the program if licensed or (ii) restricting the program's operation if not licensed, using an operating system (OS) level application" |

Defendants argue that the claim term "acting on the program according to the verification" should be construed as "(i) allowing the use of the program if licensed or (ii) restricting the program's operation if not licensed, using an operating system (OS) level application" in light of the specification. ECF No. 45 at 20. Defendants contend that the specification's description of a "license verifier application" confirms that an OS-level application performs the verification. *Id.* at 20, n.7 (quoting '941 Patent at 2:15–19).

Specifically, Defendants argue the use of "application" indicates that the invention was intended to run at the OS-level. *Id.* (citing '941 Patent at 2:15–19). Defendants point out that the patentees' statements about the invention operating at the OS-level are binding, so any attempt to narrow the scope to using an agent should be rejected. *Id.* at 21.

Defendants also claim that their construction is consistent with the specification since the allowance or restriction of the use of the program hinges on the licensing of the program. *Id.* Defendants argue that their construction is not binary and does not exclude the broad range of operations identified by the specification. ECF No. 49 at 19. Defendants point out that the preamble of the claim which provides "[a] method of restricting software operation within a license" offers support for their construction. ECF No. 45 at 21 (quoting '941 Patent at 6:58–59). Defendants also point to the specification in support of its contention that the restriction of the operation includes a broad range of actions. ECF No. 49 at 19 (citing '941 Patent at 6:46–52).

Defendants note that Ancora's proposed construction of verifying the program requires confirming whether a program is licensed. *Id.* at 18–19. In doing so, Defendants disagree with Ancora's argument that the scope of the "acting" limitation is not based on whether a program is "licensed" or "not licensed." Defendants assert that the "acting" step depends on the verification in the "verifying" step to confirm the license of the program. *Id.* at 19. Defendants contend that the "acting" step is based on whether the program is "licensed" or "not licensed" even if Ancora's interpretation of the claims was granted. *Id.*

Ancora argues that no further construction is needed for the term "acting on the program according to the verification." ECF No. 44 at 26. Ancora rejects Defendants' proposal that an OS-level application is necessary for the acting step. *Id.* Ancora points out that only the "setting up" step is performed by an agent at the OS-level. *Id.* Ancora points to the prosecution history

which demonstrates that the patentee and the Examiner understood that Claim 1 and Claim 18 did not require the OS-level agent to perform the "acting" step. *Id.* (citing Ex. 2). Ancora also notes that the "license verifier application" that runs at the OS-level is part of an embodiment that is a "non-limiting example." ECF No. 50 at 18, n.3 (citing '941 Patent at 1:44–45).

Ancora argues that Defendants' construction contradicts the specification because it improperly suggests only a binary "allowing" or "restricting" choice. *Id.* As evidence against Defendants' construction, Ancora points to the disclosure of a variety of potential actions within the specification. *Id.* (citing '941 Patent at 2:24–26, 5:60–61, 6:46–52). Ancora further argues that Defendants' construction would exclude embodiments within the specification, so the construction should be rejected. ECF No. 50 at 18 (citing *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013)).

Ancora also points out the reference to "licensed" by Defendants improperly suggests that any "acting" is based on the program's legal or contractual status. ECF No. 44 at 26. Ancora contends that the patent does not require this limitation as the verifying inquiry determines only whether a program is verified to run. *Id.* at 26–27 (citing '941 Patent at 2:10–26). Ancora notes that the specification never mentions the word licensed but teaches that "[a]cting (20) on the program includes the step of restricting the program's operation with predetermined limitations if the comparing yields non-unity or insufficiency." *Id.* at 27 (quoting '941 Patent at 2:19–20).

The Court does not agree with Defendants' construction regarding an OS-level application. *Contra* ECF No. 45 at 20. The specification only describes the use of an agent to write to the BIOS memory. *See* '941 Patent at 6:64–65. The agent may operate at the OS-level, but the agent is not an application. *See id.* In addition, the other steps ("selecting," "verifying," and "acting") do not use an agent. *See id.* at 6:63, 7:1–4. The Court is unaware of any OS-level

application, as applications run on top of the OS, while OS-level software is either the OS or the drivers. While Defendants argue that the prosecution history suggests that the application runs at the OS-level, the Court does not find the patentees' statements to be a clear and unequivocal disavowal. *See Thorner*, 669 F.3d at 1365. Moreover, the Examiner understood that the operation does not require an OS-level agent. *See* ECF No. 44, Ex. 2. As such, the operation does not need to be limited to the OS-level.

Further, contrary to Defendants' construction, the Court does not need to include the distinction between "licensed" and "not licensed." *Contra* ECF No. 49 at 18–19. This action falls under the "verifying the program" step whereas the "acting" simply consumes the output of the "verifying" step. *See* '941 Patent at 2:10–26. The Court also agrees with Ancora that no reference to "licensed" exists within the specification, so the Court does not see a need to import this limitation into the claim. *See* '941 Patent at 2:19–20.

The Court is inclined to construe the term as its plain and ordinary meaning, but the scope of "acting on the program" is unclear. Defendants also point out this ambiguity in "allowing the use." *See* ECF No. 49 at 19. Because the parties dispute the scope of the term within the claim, the Court will construe the term according to the intrinsic record. *See O2 Micro*, 521 F.3d at 1362. The only specific "acting" actions disclosed by the specification are negative. *See* '941 Patent at 6:46–52. "Allowing the use" indicates to the Court that no negative action is taking place, but the Court cannot find support that the term has an associated positive action. *See* '941 Patent at 5:43–63. For example, the specification allows for the "acting on the program" step to include "restricting the program's operation with predetermined limitations" (*see* '941 Patent at 2:19–20), "informing . . . the user" on the unlicensed status (*see id.* at 2:24–26), "halting the operation of the program" (*see id.*), and "ask[ing] for additional user

interactions" (*see id.* at 5:60–61). While the Court cites to these examples from the specification, the Court also notes that these are examples are non-limiting due to the phrase "may include." *See id.* at 6:46–52. As such, the Defendants' construction allowing for positive "acting" actions is incorrect.

Therefore, the Court construes "acting on the program according to the verification" as follows: plain and ordinary meaning, wherein the step of "acting on the program" may include, but is not limited to, "restricting the program's operation with predetermined limitations, informing the user on the unlicensed status, halting the operation of the program under question, and asking for additional user interactions."

### E. "using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS"

| Ancora's Proposed Construction | LG/Samsung's Proposed Construction |
|---|---|
| Plain and ordinary meaning<br><br>"agent" means "a software program or routine" | This limitation is a means plus function limitation governed by pre-AIA 35 U.S.C. § 112 ¶ 6.<br><br>**Function:** "set up a verification structure in the erasable, non-volatile memory of the BIOS"<br><br>**Structure:** Algorithm found at 6:18-28; if not, indefinite due to a lack of corresponding structure. |

Defendants argue that a plain and ordinary meaning for the claim term with a construction of "agent" as "any software program or routine" would contradict the applicants' prior depiction of the term as a novel concept. ECF No. 45 at 5. Applicants had claimed previously that the agent was an unknown concept in the prior art that would write an encrypted verification structure in the BIOS memory. *Id.* The Examiner highlighted the importance of the use of an agent in the alleged invention because the agent overcame the perceived difficulty of setting up a verification structure in the BIOS memory. *Id.* (citing Ex. 9 at 4). However, Defendants point out that Ancora suggests that a person of ordinary skill in the art at the time of

the alleged invention would understands that an agent is any software program or routine. *Id.* Defendants also argue that Ancora's proposed construction improperly attempts to cover all methods of performing the claimed function in violation of 35 U.S.C. § 112 ¶ 6. ECF No. 45 at 6. Defendants contend that persons of ordinary skill in the art understand that an agent "may be software, hardware, or both;" however, the applicants described agent in purely functional terms when amending Claim 1. ECF No. 49 at 3.

Defendants contend that the claim term fails to "recite sufficiently definite structure." ECF No. 45 at 6 (quoting *Williamson*, 792 F.3d at 1349). Alternatively, Defendants allege that the term recites a "function without reciting sufficient structure for performing that function." *Id.* (quoting *Williamson*, 792 F.3d at 1349). The claims at issue do not contain the words "means" or "step for," but Defendants assert that agent is a "nonce" word that can be substituted for "means" or "step for." *Id.* at 7. While the term "agent" can be defined, disparate definitions exist for the term. *Id.* As such, Defendants argue that agent does not connote a particular structure that would satisfy the requirements of 35 U.S.C. § 112 ¶ 6. *Id.*

Defendants further argue that the specification and the prosecution history confirm that agent does not connote structure. *Id.* at 8. Defendants indicate that agent is used as a "black box" to describe generic software (or software running on hardware) for performing numerous tasks. *Id.* at 9. Claim 1 requires that the agent "set up a verification structure in the erasable, non-volatile memory of the BIOS." *Id.* at 9 (quoting '941 Patent at 6:64–65). On the other hand, claim 18 also requires the agent to "extract [] license information from [a] software program," and "verify [] the application software program. *Id.* (quoting '941 Patent at 8:40, 47–48). The specification does not elucidate the term because agent was added during prosecution to overcome prior art. *Id.* (citing Ex. 5 at 3–6). Defendants contend that the alleged indefinite

structure is consistent with the applicants and Examiner's understanding that the agent performs a novel function and did not exist in prior art. *Id.* at 10.

Defendants allege that the claim does not describe how the "agent" fits in structurally with the other components of the system. *Id.* at 8. Ancora points to $E^2$PROM manipulation commands as an example of "how [the agent] accomplishes the specified operation." ECF No. 49 at 4 (citing ECF No. 44 at 18). Defendants argue that these software commands are "not an algorithm, but rather just a functional label for specific types of software." *Id.* (quoting *Digital Retail Apps Inc. v. H-E-B, LP*, No. 6-19-cv-00167-ADA, 2020 WL 376664, at *5 (W.D. Tex. Jan. 23, 2020)). The remainder of the limitation at issue fails to provide any further structure. ECF No. 44 at 8. The limitation merely recites the function of the agent, i.e., to "set up a verification structure in the erasable, non-volatile memory of the BIOS." *Id.*

If the term "agent" does not connote sufficiently definite structure, Defendants argue that "the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function" of setting up the verification structure. *Williamson*, 792 F.3d at 1351. "Structure disclosed in the specification qualifies as 'corresponding structure' if the intrinsic evidence clearly links or associates that structure to the function recited in the claim." *Id.* at 1352. Defendants assert that the only portion of the specification that resembles an algorithm can be found in the description of a preferred embodiment. '941 Patent at 6:18–28. Defendants argue that the claims must be rendered indefinite if Ancora argues that 6:18–28 is not the corresponding structure as nothing else in the specification resembles the required algorithm. ECF No. 45 at 10–11 (citing *Digital Retail*, 2020 WL 376664, at *3).

Ancora argues that the plain and ordinary meaning of the claim term should apply. ECF No. 44 at 17. Ancora disagrees that § 112 ¶ 6 applies as the claim term lacks the word "means,"

which creates a presumption that § 112 ¶ 6 does not apply. *Id.* (citing *Williamson*, 792 F.3d at 1348). Furthermore, Ancora contends that the Defendants have not provided sufficient evidentiary support to overcome the presumption. *Id.* (citing *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007–08 (Fed. Cir. 2018)). Rather, Ancora argues that the intrinsic record or extrinsic evidence demonstrate that the claim term refers to a particular structure. *Id.* (citing *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1024 (Fed. Cir. 2006)).

The term "agent" was added during prosecution to specifically elucidate that "the closest prior art systems, singly or collectively, do not teach licensed programs running at the OS level interacting with a program verification structure stored in BIOS." *Id.* at 18–19 (quoting Ex. 2 at 7). The Examiner repeatedly acknowledged his understanding that the word "agent" refers to such programs. *Id.* (citing Ex. 4 at 5–8). Ancora alleges that this evidence demonstrates that § 112 ¶ 6 does not apply. *Id.* (citing *Zeroclick*, 891 F.3d at 1008 (Fed. Cir. 2018) (holding that the district court erred in treating "'program' and 'user interface code' as nonce words"); *Collaborative Agreements, LLC v. Adobe Sys. Inc.*, 2015 WL 2250391, at *13 (W.D. Tex. May 12, 2015) ("Courts have consistently interpreted 'software' and similar terms to have sufficient structure so as to avoid an invocation of Section 112 ¶ 6.")).

Ancora argues that Defendants lack a basis for their position that agent functions as a black box term. *Id.* at 8. Ancora further argues that the Defendants do not explain how the need for one or more agents capable of performing the operations in Claim 18 shows that the more limited Claim 1 embodiment must be a means-plus-function term. *Id.* Ancora asserts that a simple claim such as claim 1 does not require a complex disclosure. *Id.* (citing *Zeroclick*, 891 F.3d at 1008) (relying on the fact that "[t]he basic concept behind both of the patents-in-suit is

relatively simple" to hold that the terms "program" and "user interface code . . . are used not as generic terms or black box recitations")).

Ancora alleges that Defendants misunderstand the reason "agent" was added to the claims. *Id.* Ancora argues that agent was added to exclude the need for additional hardware and not to provide previously missing hardware. *Id.* Ancora indicates that the file history clearly shows that the applicant explained to the Examiner the specified operation was performed solely by software. *Id.* (citing Ex. 6). Ancora argues that this evidence should allow for the avoidance of the application of § 112 ¶ 6. *Id.* at 8–9 (citing *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311 (Fed. Cir. 2004) (holding that "sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112 ¶ 6 presumptively will not apply" when the "term 'circuit' [wa]s coupled with a description of the circuit's operation")).

Ancora further argues that the extrinsic evidence also demonstrates the same understanding. ECF No. 44 at 19. Ancora's expert confirmed that the term "agent" is a well-defined and understood term in the computer industry that means "a software program or routine." *Id.* (quoting Ex. 9 at ¶ 13). Ancora also points out that dictionaries and other texts uniformly define "agent" to refer to a software program or routine. *Id.* (citing Ex. 10). Ancora also notes that Defendants possess nearly ninety patents or patent applications reciting the use of a "software agent." *Id.* (citing Seigel Decl. at ¶¶ 14-18). The patentees also submitted to the Examiner a White Paper (the "Paper") authored by one of the inventors in 2001 in support of their amendment adding "agent" to Claim 1. ECF No. 50 at 5 (citing Ex. 19 at 8). The Paper explained how "[i]n order for a user to access the BIOS $E^2$PROM[,] proprietary software" needed to be developed, and how an OS-level software agent could be used to set up the verification structure in the BIOS. *Id.* (citing Ex. 18 at 7).

Ancora also asserts that this Court should search for an algorithm only if the presumption against § 112 ¶ 6 is overcome. ECF No. 53 at 9 (citing *Digital Retail*, 2020 WL 376664, at *3). The Eastern District of Texas held similarly that an algorithm is sought "only if a term is found to be a means-plus-function term." *Id.* (quoting *Genband*, 2015 WL 4722185, at *17). Additionally, courts can use algorithms to defeat assertions of means-plus-function claiming. *Id.* at 10 (citing *Sci. Telecommc'ns, LLC v. Adtran, Inc.*, 2016 WL 6872311, at *3, n.16 (D. Del. Nov. 21, 2016) ("[T]he disclosed algorithm is sufficiently definite structure, and § 112, ¶ 6 does not apply."). Ancora argues that deviating from this precedent would render all software patents subject to § 112, ¶ 6. *Id.* Ancora contends that the presumption is preserved through Defendants' admission that the specification contains such an algorithm. *Id.* (citing *Sci. Telecommc'ns*, 2016 WL 6872311, at 3, n.16).

Ancora also disputes that the "algorithm found at 6:18-28" is the only structure identified in the patent if the term is found to be a means plus function term. *Id.* at 11. Ancora points to embodiments of this limitation that also provide structures. *Id.* at 20–21 (citing '941 Patent at 1:60–2:1, 3:51–61). Ancora argues that these alternatives are acceptable as the structure at 1:60–2:1 does not relate to "setting up a verification structure" and the structure at 3:51–61 is expressly stated by Claim 3 to suffice as a structure. *Id.* at 21 (citing '941 Patent at 1:60–2:1, 3:51–61). Ancora contends that all three algorithms must be permitted as potential structures. *Id.* (citing *Creo Prod., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1345 (Fed. Cir. 2002) (reiterating that, "in the case of a means-plus-function claim, . . . the written description may disclose distinct and alternative structures for performing the claimed function").

The Court recognizes that "means" or "step for" is not present within the claim which creates a rebuttable presumption that § 112 ¶ 6 does not apply. *See Williamson*, 792 F.3d at 1348.

The Court must determine if the Defendants have overcome the presumption by demonstrating that agent fails to "recite sufficiently definite structure" or else recites "function without reciting sufficient structure for performing that function." *See id.* at 1349. Prior to analyzing these two criteria, Defendants argue that "agent" operates as a nonce word that takes the place of "means" or "step for." *See* ECF No. 45 at 7. Defendants further argue that agent functions as a black box term since an agent can connote software, hardware, or both, so agent should be considered a means plus function term. *See id.*; *Williamson*, 792 F.3d at 1350. The Court recognizes that agent can connote software and/or hardware in some circumstances. *See* ECF No. 45 at 7. However, the term is clearly limited to software in this case, so agent is less likely to be considered a nonce word. *Contra Synchronoss*, 2017 WL 6059302, at *9–11. The patent discloses the specific operation of the agent through the $E^2$PROM manipulation commands which adds, modifies, and removes a license. *See* '941 Patent at 2:1–6. The history clearly recites an agent as a "licensed program[] running at the OS level interacting with a program verification structure stored in BIOS." *See* ECF No. 44, Ex. 2 at 7. The patentees emphasized this point during prosecution that agent was added to overcome the prior art, not to disclose additional hardware. *See* ECF No. 50 at 8. The Examiner also shared this understanding when referring to agent. *See* ECF No. 44, Ex. 9 at 4. A person of ordinary skill in the art would understand that agent is referring to software because of its complete interaction with the OS. *See* '941 Patent at 6:18-28; ECF No. 44, Ex. 2 at 7. Thus, agent does not function as a nonce word.

Defendants argue that the specification and prosecution history do not recite sufficiently definite structure for agent. ECF No. 45 at 8. However, the Court cannot agree. While this Court has found that software alone did not connote structure and warranted the application of 112 ¶ 6, the language in this case varies significantly from the functional language used in *Digital Retail*.

*Compare* '941 Patent at 6:18–28*, with Digital Retail*, 2020 WL 376664, at *5. The claim language at issue describes a piece of software within a specific piece of hardware for a specific purpose, whereas the claim language within *Digital Retail* merely describes a means for communicating. *Compare* '941 Patent at 6:18–28*, with Digital Retail*, 2020 WL 376664, at *5. Furthermore, this Court previously emphasized that the claim term lacked specific details which would improperly include all forms of communication. *See Digital Retail*, 2020 WL 376664, at *5. In this case, the disclosures at 1:60-2:1, 3:51-61, and 6:18-28, the "Paper[2]," and the dictionary definitions provide the specificity required to connote structure. *See* '941 Patent at 1:60-2:1, 3:51-61, 6:18-28; ECF No. 50, Ex. 9; ECF No. 44, Ex. 10. The patent and prosecution history also contain no contradictory explanations that would lead to a finding of functional language for the claim term. *Contra Joao*, 2015 WL 4937464, at *7. Other courts have held similarly that software connotes a definite structure. *See Zeroclick*, 891 F.3d at 1008; *WhitServe*, 2014 WL 5668335, at *4; *RLIS*, 2013 WL 3772472, at *14. Even if the term "agent" alone does not provide definite structure, Defendants also concede that a structure is present within the patent. *See* ECF No. 45 at 10 (citing '941 Patent at 6:18-28). Additionally, the Court agrees with Ancora that additional alternative structures can also be found within the patent. *See* '941 Patent at 1:60–2:1, 3:51–61. As agent means software in this case, agent also recites definite structure.

The Court disagrees with Defendants' assertion that the specification describes agent in functional terms. *Contra* ECF No. 45 at 6. As mentioned above, the claims specifically disclose the operation of the agent in the memory system. *See* '941 Patent at 6:18-28; ECF No. 44, Ex. 2 at 7. Defendants argue that Claim 18 adds additional functions to the agent described in Claim 1.

---

[2] The Court notes the Defendants' objection to the consideration of the Paper. *See* ECF No. 52 at 2. Defendants argue that the timing of the submission of the Paper indicates a different understanding of agent, but even the Defendants admit that the agent points to software specifically. *See id.* (proprietary *software* needed to be developed) (emphasis added). While the Court does grant that the Paper alone does not confirm that software provides sufficient structure at the time of filing, the Court does not consider the Paper for that issue.

*See* ECF No. 45 at 9. By contrast, the Court agrees with Ancora that Defendants do not sufficiently make the connection between Claim 18 and Claim 1 for the more limited Claim 1 embodiment to be a means-plus-function term. *See* ECF No. 50 at 8. Defendants also argue that claim 1 does not disclose the necessary hardware to perform its operation. *See* ECF No. 45 at 9. However, the Court notes that agent was added to specifically exclude hardware, not to cover any supposedly missing hardware. *See* ECF No. 50 at 8 (citing Ex. 6).

The Court determines that a plain and ordinary meaning is appropriate. *See Phillips*, 415 F.3d at 1312. As demonstrated by Ancora through its references to intrinsic and extrinsic evidence, agent has a well-established meaning of "a software program or routine." *See* ECF No. 44 at 19; ECF No. 44, Ex. 4 at 5–8. While Defendants argue that disparate definitions for "agent" exist, the patent clearly limits agent to mean software as attested to by the Examiner. *See* ECF No. 45 at 7; ECF No. 44, Ex. 4 at 5–8. Therefore, the Court construes "using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS" as its plain and ordinary meaning, wherein the plain and ordinary meaning of "agent" is "a software program or routine."

# IV.    CONCLUSION

As described herein, the Court provides the following constructions:

| Term | Court's Construction |
|------|----------------------|
| Order of the Claim 1 Steps | Use of the verification structure, as described in Limitation [c], cannot complete until the "set up a verification structure" step has completed, as described in Limitation [b]. "Acting on the program according to the verification," as described in Limitation [d], cannot complete until the "verifying the program" is completed as described in Limitation [c]. The "selecting a program residing in the volatile memory" as described in Limitation [a] can occur at any time.[1]<br><br>[1]<br><br>· Limitation [a] = "selecting a program residing in the volatile memory"<br><br>· Limitation [b] = "using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record."<br><br>· Limitation [c] = "verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS," and<br><br>· Limitation [d] = "acting on the program according to the verification" |
| "license" | The portion of the preamble reciting "a method of restricting software operation within a license . . . ." is non-limiting, and the term "license" does not need to be construed. |
| "license record" | "data associated with a licensed program with information for verifying that licensed program" |
| "set up a verification structure" | "establishing or certifying the existence of a pseudo-unique key and establishing at least one license-record location"[1]<br><br>[1] Footnote not for the jury. "Establishing at least one license-record location" may include the steps of "forming a license-record by at least partially encrypting the contents used to form a license-record with other predetermined data contents, using at least part of the pseudo-unique key; and storing the encrypted license-record" |
| "acting on the program according to the verification" | Plain and ordinary meaning, wherein the step of "acting on the program" may include, but is not limited to, "restricting the program's operation with predetermined limitations, informing the user on the unlicensed status, halting the operation of the program under question, and asking for additional user interactions." |
| "using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS" | Plain and ordinary meaning, wherein the plain and ordinary meaning "agent" is "a software program or routine |

**SIGNED** this 19th day of August, 2020.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE